# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) | Criminal No. 10-267 (ESH) |
| OLADAYO OLADOKUN, | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

On August 10, law enforcement agents obtained a search warrant for Apartment 1415 at 6210 Belcrest Road, Hyattsville, Maryland ("the apartment") by swearing to an Affidavit in Support of Application for Search Warrant ("Apartment Affidavit"). The affidavit explained the history of the agents' investigation into a so-called "account takeover" scam. Law enforcement executed the search warrant on August 11, 2010, and found the defendant, his girlfriend, Lameka Keys, and two other individuals in the apartment. After interviewing Keys, agents obtained a second search warrant for a silver Lexus parked in the visitor's parking area of the apartment building by swearing to a second affidavit ("Lexus Affidavit"). Agents then executed this warrant and searched the Lexus. Both searches recovered evidence against Oladokun.

Defendant now moves to suppress evidence seized as a result of both searches, arguing that the affidavits in support of the search warrants lacked sufficient probable cause. In addition, defendant appears to challenge the veracity of certain portions of the Lexus Affidavit. For the reasons set forth below, this motion will be denied.

# ANALYSIS

I. **LEGAL STANDARD**

    A. **Probable Cause**

A federal judge evaluating a search-warrant application to determine whether it demonstrates probable cause must "simply . . . make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The determination of probable cause cannot be made by viewing relevant facts in isolation. *See, e.g., Maryland v. Pringle*, 540 U.S. 366, 372 n.2, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003) (noting that a court was "mistaken" in its approach of considering a fact "in isolation, rather than as a factor in the totality of the circumstances"); *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984) (per curiam) (finding that a state supreme court had erred by "judging bits and pieces of information in isolation" and thereby failing to consider a law enforcement officer's affidavit in its entirety). Indeed, it is axiomatic that "[i]n determining the existence of . . . probable cause, we do not isolate each factor of suspicion, but instead look to the totality of the circumstances." *United States v. Saucedo-Munoz*, 307 F.3d 344, 351 (5th Cir. 2002). "While each fact standing alone may be insufficient, the combination of all the facts can establish probable cause . . . and certain conduct that may appear 'innocent to a lay person may have entirely different significance to an experienced [law enforcement] officer.'" *United States v. Gilliam*, 167 F.3d 628, 633 (D.C. Cir. 1999) (quoting *United States v. Catlett*, 97 F.3d 565, 573-74 (D.C. Cir. 1996)).

It is the duty of a reviewing court "to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." *Gates*, 462 U.S. at 238-39 (internal quotation marks omitted).

B.  **Veracity of Affidavit**

The standards that govern a defendant's challenge to the veracity of an affidavit used to secure a warrant are set forth in the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the Supreme Court held that:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

438 U.S. at 171-72. Likewise, under certain circumstances, an evidentiary hearing and suppression are an appropriate remedy if the affidavit contains "material omissions" that, if included, would have defeated probable cause. *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008).

## II. APARTMENT SEARCH WARRANT

Oladokun asserts that Agent Zachariadis's affidavit, which was submitted in support of the search warrant application, does not demonstrate probable cause because it contains numerous conclusory statements while lacking supporting details and direct observations. (Def. Mot at 3-7). Specifically, defendant challenges:

> the basis for Zachariadis's descriptions of how bank fraud and identity theft crimes are perpetrated (Apartment Affidavit ¶¶ 6, 27);
>
> the significance of debit and credit cards being redirected to vacant residences (*Id.* ¶ 7);
>
> the basis for evaluating the credibility and reliability of an unnamed associate of Oladokun, as well as the basis for his familiarity with Oladokun's face and voice (*Id.* ¶ 14);
>
> the basis supporting the Zachariadis's conclusion that the individual appearing in various surveillance photographs was Oladokun (*Id.* ¶¶ 8-11, 15, 16);
>
> the basis for concluding that Oladokun was engaging in the specified financial activity at the time the pictures were taken (*Id.* ¶¶ 8, 10, 11, 15, 16);
>
> the basis for FBI Special Agent Patrick Gallop's identification of Oladokun as the individual he observed enter an apartment building containing an unsecured wireless network connected to the alleged fraudulent activity (*Id.* ¶ 13);
>
> the relevance of Oladokun's presence in Jamaica at the same time a Discover credit card was used to make fraudulent purchases there (*Id.* ¶ 18);
>
> the basis for the apartment manager's knowledge that Oladokun's girlfriend, Lameka Keys, requested additional keys to her apartment but did not request a lock change, given that the manager did not work there at the time (*Id.* ¶ 19-20); and
>
> the relevance of evidence that Keys's grandmother's address was used as a business address for one of the fraudulent accounts allegedly opened by an individual resembling Oladokun (*Id.* ¶ 21).

More generally, defendant also challenges the connection between the apartment and his alleged criminal activity, claiming that "the entire application and affidavit are devoid of one single fact" supporting such a link. (Def. Mot. at 6.)

Considering Zachariadis's affidavit as a whole, and the totality of the circumstances, the Court rejects defendant's argument, for it is persuaded that Magistrate Connolly had a substantial basis to conclude that probable cause existed.

### A. The "Account Takeover" Scheme

The affidavit reveals how investigators from several banks alerted law enforcement to numerous "account takeovers" of victim credit card and bank accounts between January 2010 and June 2010. (Apartment Affidavit ¶ 6, 10, 11, 12, 15, 16, 17.) The affidavit explained how such account takeovers typically occur, and gave the basis for this knowledge—Zachariadis's prior involvement in investigations involving financial crimes (*Id.* ¶ 2), "knowledge obtained during [her] participation in th[e] investigation, knowledge obtained from other law enforcement personnel, . . . and information gained through training and experience" (*Id.* ¶ 3). An account takeover occurs when an individual contacts a financial institution pretending to be the legitimate account holder and then causes activity on the account as if he were the true owner, often by diverting checks or "replacement" credit or debit cards to a different address under the subject's control. (*Id.* ¶ 6.) A common set of telephone numbers, internet protocol ("IP") addresses, and mailing addresses were used to access many different accounts that had been taken over.

Zachariadis personally visited and observed some of these addresses used in the takeover of Chase credit card accounts and noted that at least six were either listed for sale or observed to be vacant during the time of the fraud. (*Id.* ¶ 7.) Zachariadis also observed that each of these residences had an unlocked mailbox in a location accessible to passers-by. (*Id.*) The relevance of these facts is obvious: the addresses were suitable for use as drop addresses, such that

replacement credit cards sent there would be "accessible to passers-by," including the fraudsters who caused them to be sent there in the first place.[1] (*Id.*)

B.     **Defendant's Connection to the Fraudulent Activity**

The affidavit further explained Oladokun's connection to the fraudulent account takeovers, detailing numerous instances where a "subject closely resembling Oladokun" was captured by surveillance cameras using or attempting to use fraudulently obtained credit or debit cards and checks, including two transactions using a Chase credit card in December 2009 (*id.* ¶ 8); cashing a check written from a Bank of America account (*id.* ¶ 10); negotiating checks from a different Bank of America account in December 2009 (*id.* ¶ 11); attempting to deposit a check at a Branch Banking and Trust (BB&T) branch in early 2010 (*id.* ¶ 12); using a fraudulent driver's license to open an account at Sandy Spring Bank on May 28, 2010 (*id.* ¶ 15); and making six purchases with a Discover credit card between May 13, 2010 and June 3, 2010 (*id.* ¶ 16). In March 2010, Special Agent Gallop saw Oladokun enter an apartment building containing an unsecured router utilizing the same IP address that had been used to access several of the accounts.[2] Oladokun challenges the basis for Special Agent Gallop's identification, but the affidavit makes clear that he had been involved in the investigation for at least several months at the time he saw defendant in person, and that an individual resembling Oladokun appeared in surveillance photographs as early as August 2009. (*Id.* ¶ 10.)

---

[1] Similarly, the business address given when a bank account at Sandy Spring Bank was fraudulently opened was later discovered to belong to the Oladokun's girlfriend's grandmother. (*Id.* ¶ 21.)

[2] The affidavit also explains that the router belonged to a member of the DC Metropolitan Police Department, who was interviewed by Zachariadis in early 2010 and was unaware that the wireless router in her apartment was unsecured. (*Id.* ¶ 13.)

Also in March 2010, Zachariadis interview an unnamed associate of Oladokun, who himself faces state and federal criminal charges for bank fraud and identity theft. (*Id.* ¶ 14.) This associate listened to voice recordings of a subject of the investigation calling Chase Bank customer service in connection with the account takeovers and identified the voice on both as defendant's. (*Id.* ¶¶ 9, 14.) The associate also identified Oladokun as the individual pictured in one of the surveillance photographs. (*Id.* ¶ 14.) Although Oladokun claims "no facts were set forth by the affiant as to how the informant would have known defendant's voice or defendant's photograph," the affidavit explicitly states that the informant knew the precise travel itinerary for both Oladokun and his girlfriend, Lameka Keys, specifying the date that both would be travelling to France as well as the airport they would be departing from. (*Id.* ¶ 14.) The affidavit states that federal agents ultimately confirmed the validity of this information through the Treasury Enforcement Communication System. (*Id.* ¶ 18.) The affidavit therefore included facts sufficient to support the credibility and reliability of Oladokun's associate, as well as a basis to conclude that he could identify his face and voice.

### C. Connection Between Fraudulent Activity and Apartment

Defendant challenges the connection between the apartment and the fraudulent activity described in the affidavit, claiming that "the entire application and affidavit are devoid of one single fact" supporting such a link. (Def. Mot. at 6.) On the contrary, the affidavit contains numerous facts connecting Oladokun to the fraudulent account takeovers. In addition, the affidavit contains detailed evidence suggesting that Oladokun lived in his girlfriend's apartment. The apartment manager stated that Oladokun had been living there since at least April, and he positively identified him from his driver's license photograph. (Apartment Affidavit ¶ 19.) The manager stated that Oladokun had personally paid the rent for the apartment with two postal money orders on July 23, 2010. (*Id.*) Finally, the manager stated that he had seen the defendant

in the secure areas of the apartment building both in the early morning and late evening of August 2, 2010—eight days before investigators obtained a search warrant for the apartment. (*Id.*)

Finally, Zachariadis stated that based on her training and collaboration with other law enforcement officers, "it is common for persons involved in identity theft, bank fraud, and other such fraud-related activities to secrete the proceeds or evidence of bank transactions and records of fraudulent transactions in secure locations within their residences . . . for their ready access and to conceal them from law enforcement activities." (*Id.* ¶ 25.) In addition, this evidence was corroborated by cell tower data indicating that numerous calls were made or received by one of the phone numbers connected to the fraud using cell towers located within range of the apartment. (*Id.* ¶ 22.)

For these reasons, the Court finds that Magistrate Connolly had a substantial basis to conclude that probable cause existed to search the apartment, and therefore defendant's motion to suppress the evidence seized pursuant to this search warrant is **DENIED**.

### III.    LEXUS SEARCH WARRANT

Defendant has also moved to suppress the laptop computer seized pursuant to the search of the silver-colored Lexus on August 11, 2010. As the Supreme Court has long held, however, "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). Therefore, under *Rakas v. Illinois*, 439 U.S. 128 (1978), defendant "bears the burden on [his] motion to suppress of establishing not only that the search was unlawful, 'but also that he had a legitimate expectation of privacy'" in either the car searched or the items seized. *United States v. Zabalaga*, 834 F.2d 1062, 1065 (D.C. Cir. 1987) (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)).

In *Zabalaga*, the Court upheld the denial of a motion to suppress evidence seized from a locked safe found in a car when the defendant failed to establish that he owned or leased the car, failed to provide evidence that he drove the car or had permission to do so, disclaimed ownership of the vehicle at the time of the arrest, and did not assert that he had any claim to personal goods stored in the car or that there were personal markings on any of the goods in the car that would suggest his legitimate expectation of privacy in the car or the safe. 834 F.2d at 1064-65. Similarly, in *United States v. Mitchell*, the Court upheld the denial of a motion to suppress drugs found in a car in which the defendant was a passenger, finding that the defendant lacked a legitimate expectation of privacy in the car or in the drugs placed within it. 951 F.2d 1291, 1293, 1298-99 (D.C. Cir. 1991) (explaining that the defendant was merely a passenger who had been picked up to go for a ride in a car that was purchased by another individual that day, and the drugs found in the car were not marked or wrapped in such a way as to suggest ownership, an intent to exclude others, or to hide the identity of the contents).

Likewise, Oladokun has failed to carry his burden of demonstrating a legitimate expectation of privacy in the vehicle or the items recovered from it. Oladokun has presented no evidence to show that he owned the car or had possessory interest in its contents. Indeed, he has presented evidence suggesting he was merely a passenger in the vehicle the evening before the search. (Def. Mot Ex. 3 [Affidavit of Lameka Keys] ¶¶ 4-7.) Therefore, the Court finds that Oladokun has presented insufficient evidence to sustain his burden to establish "that he himself was the victim of an invasion of privacy" when the police searched the Lexus, *United States v. Salvucci*, 448 U.S. 83, 86 (U.S. 1980), and his motion to suppress evidence found within it is therefore **DENIED**.

**SO ORDERED.**

                                            /s/
                                ELLEN SEGAL HUVELLE
                                United States District Judge

Date: January 14, 2011